STATE *v.* JOHN TURLEY.

November Term, 1912.

Present:   ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

Opinion filed October 13, 1913.

*Jury—Examination—Scope—Homicide—Evidence — Relevancy —Witnesses—Impeachment—Corroboration—Misconduct of Counsel—Objection — Instructions — Applicability to Evidence—Exceptions—Presumptions.*

It is not error to refuse to allow counsel for respondent to ask jurors on *voir dire* whether they know that respondent is entitled to a presumption of innocence that should be weighed in his favor, and whether they know that in order to convict him they must be convinced of his guilt beyond a reasonable doubt.

The nature and scope of inquiries that may be made on preliminary examination of jurors is largely within the discretion of the trial court, and the exercise thereof will not be revised except in case of abuse.

It was not error to refuse to allow counsel for respondent to ask a juror on *voir dire* what his verdict would be in case the indictment was read, but no evidence put in.

In a prosecution for homicide, where the State claimed that the motive for the crime was respondent's jealousy of deceased because of his attentions to a certain woman, and there was evidence that respondent had called on her several times, walked home with her from church, and had inquired of her concerning deceased's visits in a way that brought from her a denial that deceased's visits at her home were on her account, a witness who testified that he was at the woman's house on the night of the homicide and had been there once before, was properly allowed further to testify that on the prior occasion respondent was also there.

It was not error to refuse to strike out all that a witness had said on a designated subject on direct examination, because it appeared on cross-examination that some of that testimony was hearsay.

Hearsay evidence elicited by the cross-examiner himself was properly in the case.

Where the admissibility of evidence of a conversation depends on whether respondent heard it, and it appears that he must have heard some of it and that the circumstances were such as to warrant the inference that he heard the whole of it, the evidence is admissible.

Where an attempt is made to discredit a witness on the ground that his testimony is given under the influence of some motive prompting him to make a false or colored statement, that may be met by showing that he made similar statements at a time when the imputed motive did not exist.

In a prosecution for homicide, where respondent, on cross-examination of a State's witness also indicted for the homicide, elicited that the witness had talked the case over with the state's attorney, but the record fairly showed that it was not claimed that any inducement had been held out to him to testify against respondent, it was error to allow the State on redirect examination, and to corroborate the witness, to introduce a written statement of the facts to which he had testified, made by him to inform his attorney of the circumstances of the case.

Where one objection to the admission of evidence was made below and only another argued on review neither will be considered.

Where evidence is introduced tending to impeach the character of a witness for truthfulness, the party calling him is entitled to give

evidence in support of his general character in that regard, but that rule does not allow evidence to be given that the witness on other occasions has made statements similar to or consistent with his testimony.

After the State had shown that respondent's witness had made statements out of court inconsistent with her testimony, respondent was not entitled to corroborate the witness by introducing portions of her testimony before the grand jury in harmony with her assailed testimony.

Where argument of counsel was objected to on trial on one ground and only another is argued on review, neither will be considered.

The challenged statement of counsel in argument that every person to whom the evidence pointed as being in a position to know anything about the crime had been called as a witness will be taken to be true on review, unless the exceptor shows the contrary.

In a prosecution for homicide, an instruction that the jury should consider all the evidence as to respondent's state of mind, and to aid in determining that question should also consider what was said by him if they found that it was he that went across the street in the direction that decedent had gone, as designated witnesses had testified, left it to the jury to find whether the person who so crossed the street was respondent.

In a prosecution for homicide, where, though no witness directly testified that respondent was intoxicated on the night in question, there was evidence that he had been drinking to such an extent that the jury would be warranted in finding that he was more or less under the influence of liquor, it was not error to charge on involuntary intoxication as a defence to a criminal charge.

It was not error to refuse requested instructions, presented at the close of the charge and referring to subjects covered thereby, where no suggestion was made that the charge on those subjects was inadequate.

INDICTMENT for murder. Plea, not guilty. Trial by jury at the September Term, 1911, Washington County, *Taylor,* J., presiding. Verdict, guilty of murder in the second degree, and judgment thereon. The respondent excepted. The opinion states the case.

*Richard A. Hoar* and *John H. Senter* for the respondent.

It was error to exclude the questions asked on *voir dire.*
"A party to a civil action, or a person accused of crime, has the
right to submit a proposed juror to such reasonable examination,
as will enable the court to see that the juror stands indifferent
and that he is possessed of the requisite qualifications, or as will
enable him intelligently to exercise the right to peremptory
challenge, when that course may be deemed necessary or advis-
able." *O'Mara* v. *Com.,* 75 Pa. St. 424; *State* v. *Godfrey,* 1
Brayt. 170; *Com.* v. *Stockley,* 10 Leigh. 712; *State* v. *Norris,*
1 Hayw. 429; *State* v. *West,* 46 La. Ann. 1009; *People* v. *Car
Soy,* 57 Cal. 102; *Union Pac. R. Co.* v. *Jones,* 21 Colo. 340;
*O'Hare* v. *Chicago etc. R. Co.,* 139 Ill. 151; *Lavin* v. *People,*
69 Ill. 304; *Pearcy* v. *Michigan Mut. etc. Co.,* 111 Ind. 59;
*Stephens* v. *People,* 38 Mich. 739; *State* v. *Mann,* 83 Mo 589;
*State* v. *Taylor,* 64 Mo. 358; *Basye* v. *State,* 45 Neb. 261; *Com-
fort* v. *Mossier,* 121 Pa. St. 455; *Houston etc. R. Co.* v. *Terrill,*
69 Tex. 650; *Lewis* v. *United States,* 146 U. S. 376.

*John G. Sargent,* Attorney General, and *J. Ward Carver,*
State's Attorney, for the State.

POWERS, J.   Charged with the murder of John McAuley,
who was clubbed to death at Websterville on the night of July
11, 1911, John Turley, the respondent, was convicted of murder
in the second degree.

On *voir dire,* his counsel asked several of the jurors if they
knew that the respondent was entitled to a presumption of inno-
cence which was to be weighed in his favor, and if they knew
that, in order to justify a conviction, they must be convinced of
his guilt beyond a reasonable doubt.   These questions were sev-
erally objected to and excluded, and the respondent excepted.

The nature and extent of the inquiries which may be made
on the preliminary examination of jurymen is largely within
the discretion of the trial court.   *Fowlie's Admx.* v. *McDonald,
Cutler & Co.,* 85 Vt. 438, 82 Atl. 677.   In the nature of things
they cannot be governed by fixed rules.   They are not to be con-
fined to matters directly affecting the legal qualifications of the
juror, and, ordinarily, considerable liberality is and should be
indulged,—to the end that the respondent may possess himself
of sufficient information regarding the jurors to guide him prop-
erly in the exercise of his right of challenge.   Yet this examina-

tion is to be conducted under the supervision of the court, and the exercise of its discretion therein will not be revised, except in cases of its abuse. Accordingly, it was held in *State* v. *Flint,* 60 Vt. 304, 14 Atl. 178, that it was not error to allow the jurors to be asked whether they would disregard the testimony of an accomplice, and in *State* v. *Smith,* 72 Vt. 366, 48 Atl. 647, that it was not error to refuse to allow the jurors to be asked if they were clients of a lawyer who was to be a material witness. Jurors are not required or expected to be learned in the law. *S. A. & A. P. Ry. Co.* v. *Belt,* (Tex.) 59 S. W. 607; *Brown* v. *Florida,* 40 Fla. 459, 25 So. 63; *People* v. *Conklin,* 175 N. Y. 333, 67 N. E. 624. In the case last cited it was held that it was proper to refuse to allow the jurors to be asked if they knew that in law the accused in a criminal case was presumed to be innocent until proved guilty, and that the proof in a criminal case must be stronger than in a civil case. And in *Ryan* v. *State,* 115 Wis. 488, 92 N. W. 271, it was held proper to exclude the question whether the juror knew that the defendant in a criminal case was entitled to the benefit of the presumption of innocence.

Nor was there error in refusing to permit the respondent to ask a juror what his verdict would be in case the indictment was read, but no evidence put in. This, too, is covered by the rule given; and it is held that it was not error to refuse to allow jurors to be asked how they would act or decide in certain contingencies or upon a certain state of evidence. *Woolen* v. *Wire,* (Ind.) 11 N. E. 236; *Com.* v. *Van Horn,* (Pa.) 41 Atl. 469; *State* v. *Cross,* (Conn.) 46 Atl. 148; *State* v. *Huffman,* (Oh.) 99 N. E. 295; *Ryan* v. *State, supra.*

Robert O'Harin was a witness for the State. He was at the Staples house, as was the respondent, on the night of the homicide, and he testified that he had been there once before. Subject to exception, he was allowed to state that the respondent was there on that former occasion. This was admitted under the claim of the State that the respondent was "paying attention" to Rebecca Staples, who lived there, and that his jealousy of McAuley was a motive for the crime. It is argued that no evidence was supplied showing any relations between the respondent and Rebecca, or between McAuley and Rebecca; and none of jealousy of McAuley on the respondent's part; and that for these reasons the testimony was inadmissible. It may be

admitted that the mere fact that the respondent was at the Staples house on a former occasion was of no consequence. It was only important as it bore upon his relations with or state of mind toward the girl. But it cannot be said that this evidence stood entirely alone, or that this claim of the State was wholly unsupported. There was evidence that the respondent had been to see Rebecca several times that summer; that he had walked home with her from church in the evening; that he was inquiring of her concerning McAuley's visits in a way to bring from her a denial that he was coming to the house on her account; that he claimed that she was "his girl"; and that both he and McAuley claimed that they were going to marry her. Not enough, it must be admitted, to make a case of very ardent wooing, but enough to go to the jury to be weighed for what it was worth.

Luigi Germani, another witness for the state, testified that two men were down by a dump in Websterville on the night of the homicide selling beer, and that these men left Websterville on the Saturday following. In cross-examination it appeared that some, at least, of the witness' information regarding the departure of these men was hearsay. The respondent then asked that all the witness had said on that subject be stricken out. But the court declined, saying that the witness had testified "that they were there in the morning, and when he came at noon they were gone." To which counsel for the respondent replied, "Yes, but I am covering that whole period by what somebody told him; I ask to have that stricken out. * * *" It appears from this statement of the court, assented to by the respondent, that there was in the witness' testimony a basis for personal knowledge of the fact of the departure of the men, independent and apart from the information received from others. Of course so much hearsay as the cross-examiner brought out was properly in the case. *Davis* v. *Streeter*, 75 Vt. 214, 54 Atl. 185; *State* v. *Jackson*, 79 Vt. 504, 65 Atl. 657, L. R. A. (N. S.) 1245. Subsequently, the motion to strike out was so modified as to cover only such of the witness' direct examination as appeared from the cross-examination to be hearsay; but the admission of what the witness' testimony disclosed, as stated above, was not retracted or modified. The statement that these men left on Saturday is the only thing in the witness' direct-examination of which the respondent now complains; but

in view of the concession, it cannot be said that this statement was wholly based on hearsay, and it was not error to refuse to strike it out. Moreover, it is quite unapparent how this fact could, by any possibility, harm the respondent, and he does not here claim or suggest that he was prejudiced by it.

Alphonse Primavera, himself under indictment for this very crime, was a witness for the state and testified fully. He was a neighbor of the Staples' and was at their house that night when Turley, McAuley, Rebecca Staples and others were present. They were all sitting on the piazza, which was about eleven feet long and four feet wide,—Turley and the girl being near each other. The witness in detailing the conversation which he had with McAuley and Rebecca, testified that McAuley said he was going "to marry her, too"; that Jack, evidently meaning the respondent, said that he was going to get married a week from the next Sunday; that when the witness asked him to whom, he replied, "Don't you know she is my girl?" the witness testified that he replied that he did not, but that in fact he did know it, for he had told him so before; the witness then went on to state that he told them if they got married he would buy a barrel of beer and treat everybody; and that McAuley then said, "Alphonse, I guess you have got to buy a barrel of beer, for I am going to get married to that girl." All these references were to Rebecca Staples. The only objection interposed by the respondent to this conversation was that there was "no evidence that Turley heard this talk."

This testimony was not admitted for the usual purpose of establishing an admission, but to sustain the state's claim that Turley was hostile to McAuley on account of jealousy. Some of this conversation, at least, must have been heard by Turley, for he joined in it. As for the rest, it is enough that he was in a position to have heard it, and the circumstances were such that an inference could reasonably be drawn therefrom that he did in fact hear it. Whether he did hear it or not, was, of course, for the jury. *State* v. *Ross,* (N. J.) 62 Atl. 695.

During the cross-examination of Primavera, he was asked if he had talked the case over with his counsel and the state's attorney; before he answered, the Attorney General asked the purpose of the inquiry. In explaining, the respondent's counsel said, in effect, that it was apparent from the examination that the state's attorney knew what the witness was going to

testify to, and that there must be some arrangement between them. When this explanation was made the Attorney General made no objection, but said he only wanted to know if it was for the sake of showing that there was some inducement. To which counsel replied, "It was for that very reason." The witness went on to state that he had talked over the case with the state's attorney and that it was on the morning of that day; that he then told the story as he had related it on the stand, but that there was no promise or agreement between him and the state's attorney. In re-direct examination a paper of three sheets, containing a statement of the facts testified to by Primavera, was produced by the state's attorney and marked for identification. It was shown the witness, and he testified that he wrote it, beginning July 24 and finishing on July 26. He was then asked for what purpose he wrote it, and the question was objected to on the ground that the paper showed for itself and that "his inner mind is not proper evidence." Subject to exception, he was allowed to testify that he wrote it to inform his attorney of all the circumstances of the case. In view of the objection made, however it might be otherwise, the admission of this statement was without error. The paper itself was subsequently admitted and if, as counsel claimed, it showed for itself, the witness' statement could not have harmed the respondent, unless it conflicted with the writing, which is not claimed. Unprejudicial error does not reverse. *State* v. *Bean,* 77 Vt. 384, 60 Atl. 807; *State* v. *Roby,* 83 Vt. 121, 74 Atl. 638.

The respondent also excepted to the admission of the paper, but on another ground. It is plain that this paper was inadmissible, *Lavigne* v. *Lee,* 71 Vt. 167, 42 Atl. 1093, unless it came within the rule laid down in *State* v. *Flint,* 60 Vt. 304, 14 Atl. 178, and approved in *State* v. *Bean,* 77 Vt. 384, 60 Atl. 807. This rule is that when an attempt is made to discredit a witness on the ground that his testimony is given under the influence of some motive prompting him to make a false and colored statement, it may be shown in reply that he made similar statements at a time when the imputed motive did not exist. The determinating question, then, is whether Primavera had been discredited in this way. As we have seen he had been asked about an interview with the state's attorney, which he admitted; and about an arrangement with that official, which he denied. This is all the evidence on that subject which was received. The

fact that the witness had had an interview with the state's attorney standing alone or in connection with the fact that he took the stand as a witness, did not discredit him or afford evidence of an arrangement between them.  As the matter was left, no claim or argument affecting the credibility of the witness on the ground now under consideration could have been made.  Of course Primavera was testifying as one indicted for the same crime, and this afforded the respondent a basis for a claim that his testimony was colored by his interest; but no claim that he was testifying under a promise of indemnity or anything of that kind could have been made.  But it is claimed that the respondent by his attitude, made the evidence admissible.  It is true that his counsel at one time intimated that the fact if an interview was had between the witness and the state's attorney would be evidence of an arrangement, but this was abandoned before the paper was admitted.  It is also true that at another time, he was asked by the court if he intended to argue from what had been developed that Primavera testified under inducement, and replied to the effect that he intended to argue from all the evidence legitimately in the case, but whether it would be that he would argue that Primavera testified under inducement or not he could not say; that it would depend upon what developed.  To which the court replied, "Well, there is evidence from which an inference of that kind might be drawn, that you would argue the inference.  * * *  That being so, we must treat the matter as the law treats it where the credibility of a witness is attacked."  Had the ruling admitting the writing come at this point, it would be a grave question whether the attitude of counsel would not have justified the admission of the paper.  But the ruling did not come then.  Indeed, this discussion was not over the admission of the paper which was received, but over another of somewhat similar import which was not admitted.  The paper in question was offered several times before it was admitted; and before it was actually admitted, counsel for the respondent clearly abandoned any claim (if he ever made one) that the witness Primavera was testifying under inducement.  He said: "* * *  We don't make any issue that inducement was given.  I haven't seen any evidence indicating that. * * *  We have got no evidence to show any inducement."  And he called upon the Attorney General to indicate any such evidence; and he replied that the court had it in mind.  On another occa-

sion prior to the ruling admitting the paper, counsel for the respondent said: "In the first place, the respondent has made no issue in this case that can conceivably make them (the paper in question) admissible. All we have done in any way is to ask the witness if he had any inducement. We have offered no evidence; we have not told the court we had any evidence to offer; we simply asked the questions which we had a right to ask on cross-examination,—if he had inducement, and he replied, no; that was as far as we have gone. * * * Now, I want to reiterate; in the first place, we have made no issue here, so far; although the court asked me if I would agree not to argue in issue; I couldn't agree at that time not to argue whatever might be legitimately in the case; there is no evidence in the case tending to show any inducement on the part of Alphonse Primavera to testify here because of inducement. * * * Now so far as the case now stands, there isn't any evidence tending to show an inducement, nor any evidence upon which the respondent's counsel can argue inducement. There may be, and when there is, then it may be proper to introduce this evidence; but now there is no evidence."

On still another occasion when the paper was offered but before it was admitted, he said: "We object to the reception of these (the paper in question) for the reason stated last night; we have made no point, have put in no evidence, nor put in any issue, simply asked the question if he had been promised anything. There isn't any attempt made by the respondent to show any collusion with the respondent (witness) or anybody else."

That the court was not relying upon anything which respondent's counsel had claimed or on any position it had previously taken appears from what it said when the paper was admitted, as follows: "Now the only serious question that I have about this matter is whether what Mr. Senter finally says with reference to the tendency of the evidence would change the situation, at all. * * * And I am rather inclined to think that even the disavowal that is made does not entirely take care of it. There are certain questions asked which have no legitimate tendency, excepting to show a condition or state of facts from which the witness might gather that he was benefited. * * * Now my view of it is, that the questions asked lead to the natural inference that he testifies expecting to be benefited

by his testimony in his own case. Now even if that is not argued by respondent's counsel, it is an inference that the jury might draw; and that being so, we think that the state is right in urging that these statements (the paper in question) be received.''. The paper was thereupon admitted and the respondent excepted.

Whatever may have been the attitude of respondent's counsel in the early stage of the discussion, it is clear that before the ruling was made admitting the paper, he had made it plain to the court that he made no claim that Primavera was testifying under inducement. Nor did the evidence received go far enough to warrant an inference against him on that account. That he nursed a hope of some benefit or advantage, without word or intimation from the state's attorney, would not be enough to make his previous statements admissible in corroboration under *State* v. *Flint;* for, for aught that appears that hope existed when the paper was written.

Nor was it enough to make the Primavera statement admissible that the respondent claimed that his testimony was unworthy of belief. It is only when the character of a witness is impeached by evidence that it can be sustained by evidence. This sufficiently appears from *Stevenson* v. *Gunning's Estate,* 64 Vt. 601, 25 Atl. 697.

The receipt of the statement was reversible error, for it must have counted against the respondent.

When Rebecca Staples was on the stand as a witness for the state, the Attorney General asked her two or three questions regarding certain inconsistent statements made by her out of court. These questions were answered subject to exception. The objection below, however, was that this was hearsay; while here, it is argued that this was an attempt by the state to impeach its own witness. In these circumstances, neither question is presented for consideration. *Jewell* v. *H. T. & W. R. Co.,* 85 Vt. 64, 81 Atl. 238.

After the State had introduced evidence tending to show that Rebecca Staples had made statements out of court inconsistent with her testimony, the respondent, for the avowed purpose of corroborating the testimony given by her at the trial, offered certain portions of the testimony given by her before the grand jury, which, it was claimed, were in harmony with her testimony at the trial.

These were excluded and the respondent excepted.

As we have already seen, the general rule is that evidence that a witness has made statements similar to those testified to is not admissible. *Lavigne* v. *Lee, supra.* But the respondent insists that the action of the state in giving evidence of her inconsistent statements to impeach her, opened the door to him to give in evidence her consistent statements to sustain her.

When evidence is introduced which tends to impeach the character of a witness for truthfulness, it is competent for the party calling him to give evidence in support of his general character in that behalf. *State* v. *Roe,* 12 Vt. 93; *Paine* v. *Tilden,* 20 Vt. 554; *Sweet* v. *Sherman,* 21 Vt. 23; *Mosley* v. *Vt. Mut. Fire Ins. Co.,* 55 Vt. 142. It is to be observed that this rule goes no further than to admit general evidence on that subject. Though, as here, the impeaching evidence may be in the form of inconsistent statements, the rule does not allow testimony to be given showing that the witness has, on other occasions made statements similar to what he has testified in the cause. 1 Greenlf. Ev. (15th Ed.) §469; *Knight* v. *State,* 114 Ga. 48, 39 S. E. 928, 88 Am. St. Rep. 17; *State* v. *McDaniel,* 68 S. C. 304, 47 S. E. 384, 102 Am. St. Rep. 661; *Legere* v. *State,* 111 Tenn. 368, 77 S. W. 1059, 102 Am. St. Rep. 781; *Com.* v. *Jenkins,* 10 Gray 485; *Com.* v. *Harper,* 89 Mass. 539; see, also, *Conrad* v. *Griffey,* 11 How. 480, 13 L. Ed. 779. This very distinction was pointed out in *Gibbs* v. *Linsley,* 13 Vt. 208, wherein it is said: ''Where a witness has been discredited by showing that he has given contradictory accounts of the transaction, there, it has formerly been holden, he might be sustained by showing that he had previously given the same account that he now gives in his testimony. * * * But this has been entirely repudiated.'' And after calling attention to the holding in *State* v. *Roe,* the court says that when a witness' character is impeached, he cannot be sustained by proof of consistent statements.

As hereinbefore stated, this evidence of Rebecca Staples' former consistent statements was offered by the respondent to corroborate her. The same thing was true in *Gibbs* v. *Linsley.* This should not be overlooked. Had the evidence been offered as tending to dispel the inference that the alleged inconsistent statements were, in fact, ever made by her, a very different question would have been presented. See 2 Wig. Ev. §1126.

We take no time with the exceptions regarding the testimony of Grocci and Judge Scott, as it is perfectly clear from the record that the respondent could not have been prejudiced by what was received or excluded. The contrary is not suggested in the brief.

At the close of the evidence, the respondent moved for a verdict of acquittal, which was overruled and he excepted. On this exception the transcript is referred to and has been carefully examined. In view of the reversal made necessary by the error in admitting the Primavera statement, a review of the evidence in this record would be of little, if any, value. It is enough, therefore, for present purposes, to say that this motion was properly overruled. Though the evidence was rather weak in places, we cannot say that the case ought to have been taken from the jury.

During argument, it was stated by the state's attorney, in referring to a man who was seen late that night going down toward the place where the killing took place, that Mrs. Pelkey, a witness for the state who saw him, did not know him, but that she asked Rebecca Staples who it was and she said it was Jack Turley. This was objected to on the ground that there was no such testimony. It is now argued that it was a misuse of the evidence; that the testimony of Mrs. Pelkey as to what Rebecca told her was admitted to impeach Rebecca and for nothing else. But this is not the point made below. If the argument is well grounded, a suggestion to the court would have resulted in setting the matter right. The ruling allowing the argument to stand was, in the circumstances, without error.

Nor can the exceptions saved to the argument of the Attorney General avail anything. The statement objected to was that every person to whom the evidence pointed as being in a position to know anything about the crime had been called as a witness. Even if this statement was not made harmless by the Attorney General's explanation which followed the objection, we will assume that it was true and that it was justified by the evidence; because the brief does not point out any such person who was not summoned, or to any place in the record where its untruth can be established. We cannot search the record to discover such evidence.

In charging the jury on the subject of malice, the court said: "You should consider all the evidence as to the respond-

ent's state of mind * * * and to aid you in determining that, you will consider * * * what was said by him, if you find it was he that went across the street as testified to by Mr. and Mrs. Pelkey, in going in the direction that McAuley had gone.'' This was excepted to on the ground that the Pelkeys did not attempt to identify the man. The court did not. It left it to the jury to say, for the instruction was conditional and made to depend on the jury's finding that the man referred to was the respondent.

The respondent also excepted to that part of the charge that dealt with voluntary intoxication as a defence to a criminal charge. No claim is made that the instruction given involved an error of law, but it is claimed that there was no evidence that the respondent was under the influence of liquor that night. It is true that no one, in terms, so testified; but there was evidence that he had been drinking, and to such an extent that the jury would be warranted in inferring that he was more or less affected by it.

At the close of the charge, counsel for the respondent orally requested the court to give two certain instructions. These referred to subjects covered by the charge; no exception was taken to the charge thereon, or to the failure of the court to charge thereon; no suggestion was made that the charge was inadequate on those subjects; the requests were out of time, and it was not error to refuse them.

Other exceptions were saved but they are not briefed.

*Judgment and sentence reversed and cause remanded.*